## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NSC WHOLESALE HOLDINGS LLC, et al., | ) | Case No. 18-12394 (CSS) |
| | ) | |
| Debtors. | ) | |
| ——————————————————— | ) | |
| EDWARD P. BOND as Liquidating Trustee | ) | |
| for the NSC LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No.: 20-50962 (CSS) |
| | ) | |
| SCOTT ROSEN, CARRIE ROSEN, EVA | ) | **Related Adv. Docket Nos.: 18, 21** |
| ROSEN TRUST FBO SCOTT ROSEN, | ) | |
| EVA ROSEN TRUST FBO CARRIE ROSEN, | ) | |
| EVA ROSEN TRUST FBO NEIL ROSEN, | ) | |
| MICHAEL P. GOLD and JOHN DOE 1-10 | ) | |
| and JANE DOE 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

## <u>OPINION</u>

| | |
|---|---|
| **BAYARD, P.A.** | **GIBBONS P.C.** |
| Evan T. Miller | Christopher Viceconte |
| Steven D. Adler | 300 Delaware Avenue |
| 600 N. King Street, Suite 400 | Suite 1015 |
| Wilmington, DE  19801 | Wilmington, DE  19801 |
| | |
| Counsel for Scott and Carrie Rosen, | Counsel for Edward P. Bond |
| Michael Gold, the Eva Rosen | as Liquidating Trustee for the |
| Trust FBO Scott Rosen and the | NSC Liquidating Trust |
| Eva Rosen Trust FBO Carrie Rosen | |

Dated: February 9, 2022

Sontchi, J. _____

## INTRODUCTION[1]

Before the Court are two *Motions to Dismiss the Complaint*, one filed by the Individual Defendants,[2] and one filed by the Trust Defendants.[3] All Defendants collectively argue that Counts I-III of the Trustee's Complaint should be dismissed with prejudice pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).

In opposition,[4] the Trustee argues that the Complaint sufficiently pleads claims against all Defendants for negligent misrepresentation, common law fraud, and breach of fiduciary duty. To that end, the Trustee argues that he is entitled to a relaxed pleading standard and discovery to substantiate these claims and to amend the Complaint if necessary.

For the reasons set forth herein, the Court will grant in part and deny in part. Counts I-II are dismissed against all Defendants without prejudice. Count III is dismissed against the Trust Defendants and Carrie Rosen without prejudice. The Court will deny the Individual Defendants' *Motion to Dismiss* as to Count III against Scott Rosen and Michael Gold.

---

[1] Terms used but not defined herein shall have the meaning ascribed to them *infra*.

[2] Adv. D.I. 18. Citations to this Adversary Proceeding will be "Adv. D.I.," whereas citations to the main bankruptcy case will simply be cited as "D.I."

[3] Adv. D.I. 21.

[4] Adv. D.I. 24.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to § 157(b)(2) and this Court has the Constitutional authority to enter final orders.[5]

## STATEMENT OF FACTS

The Debtors[6] owned and operated eleven general merchandise close-out stores throughout New Jersey, New York, Massachusetts, and Pennsylvania under the name "National Wholesale Liquidators."[7] NSC Wholesale Holdings, LLC ("NSC") was the primary operating entity for the Debtors' business enterprise.[8] The Debtors' stores were "targeted to lower and lower/middle income customers in densely populated urban and suburban markets."[9]

Similar to many retailers, over the last few years, the Debtors experienced declining sales and rising costs associated with doing business as a predominantly "brick

---

[5] In accordance with Fed. R. Bankr. P. 7008 and Local Rule 7008-1, the Trustee consents to the entry of final orders or judgments by this Court. *See Complaint*, Adv. D.I. 1, ¶ 5.

[6] The Trustee brings this Adversary Proceeding on behalf of the NSC Liquidating Trust.

[7] Adv. D.I. 1, ¶ 10.

[8] *Id.*, ¶ 21. Debtors, National Wholesale Liquidators of Lodi, Inc. ("NWL Lodi") and Top Key LLC ("Top Key"), also maintained limited operations. NWL Lodi operated a liquor store at the Debtors' Lodi, New Jersey location, and Top Key operated a liquor store in Long Island City, New York.

[9] D.I. 2, ¶ 8 (Declaration of Mark Samson).

and mortar" retailer.[10]  Accordingly, after considering their options, on October 24, 2018, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

On July 16, 2019, this Court confirmed the Debtors' Combined Disclosure Statement and Plan;[11] the Plan became effective on August 7, 2019. Pursuant to Article II of the Plan, a Liquidating Trust was established to (a) liquidate the Assets of the Trust in a manner calculated to conserve, protect and maximize the value of the Assets; and (b) collect and distribute the Assets of the Trust and income and proceeds therefrom to the Beneficiaries (as defined by the Plan).[12] Edward P. Bond was appointed as Liquidating Trustee.[13]

On October 23, 2020, Mr. Bond, in his capacity as Trustee of the NSC Liquidating Trust, instituted this Adversary Proceeding by filing a Complaint alleging causes of action for, among other things, negligent misrepresentation, common law fraud, and breach of fiduciary duty. On February 8, 2021, the Individual Defendants and the Trust Defendants each filed *Motions to Dismiss the Complaint*.[14] The Trustee filed an Omnibus Objection to the *Motions to Dismiss* on March 22, 2021,[15] and the Defendants each filed a reply on April 12, 2021.[16] This matter is now ripe for determination.

---

[10] *Id.*, ¶ 13.

[11] D.I. 586 (Confirmation Order).

[12] *Id.*, Article II, § 2.2.

[13] *Id.*, ¶ 72.

[14] Adv. D.I. 18, 21.

[15] Adv. D.I. 24.

[16] Adv. D.I. 33.

## A. *The Parties*

At all relevant times, Defendant Scott Rosen ("Scott") was the Sole Manager and Chief Executive Officer of NSC and NWL Lodi. Defendant Carrie Rosen ("Carrie") is alleged to have been a "former manager, employee and/or control person of NSC,"[17] and its "clothing buyer,"[18] while Defendant Michael Gold ("Gold") was the former Chief Financial Officer of NSC.[19] Together, the Court will refer to these Defendants as the "Individual Defendants."

As for the "Trust Defendants," the Eva Rosen Trust FBO Scott Rosen (the "Scott Trust") and the Eva Rosen Trust FBO Carrie Rosen (the "Carrie Trust") are alleged to have been former members of NSC and shareholders of NWL Lodi.[20] The Trust Defendants and the Individual Defendants will collectively be referred to as "Defendants."

NSC and NWL Lodi were owned by the Trust Defendants and by the Eva Rosen Trust FBO Neil Rosen (the "Neil Trust").[21] Specifically, the Scott Trust owned 33.34%, while the Carrie and Neil Trusts each owned 33.33%.[22] Allegedly, the Scott Trust was

---

[17] Adv. Pro. D.I. 1, ¶ 16.

[18] *Id.*, ¶ 33.

[19] *Id.*, ¶ 17.

[20] *Id.*, ¶¶ 18-20.

[21] *See* Adv. Pro. D.I. 51-52. Although the Trustee originally also brought suit against the Neil Trust, that Adversary Proceeding has voluntarily been dismissed with prejudice.

[22] Adv. Pro. D.I. 1, ¶ 22.

controlled by Scott and Carl Rosen, as co-trustees, and the Carrie Trust was controlled by Carrie and Carl Rosen, as co-trustees.[23]

**B.  *The Prepetition Loan***

Capital One, National Association ("Capital One") was the Debtors' senior secured lender, holding a lien on substantially all of the Debtors' assets and property, including a first priority security interest in the Debtors' collateral.[24]

On October 26, 2015, Capital One, as Lender, NSC, as Borrower, and other Debtors, as Guarantors, entered into an Amended and Restated Credit Agreement (the "Prepetition Credit Agreement").[25] Pursuant to the Prepetition Credit Agreement, `Capital One provided revolving and term loan credit and issued letters of credit for NSC. Also, among other things, NSC was provided with $20 million in revolving loan commitments, including a $2 million letter of credit sub-facility and $2.5 million in delay draw term loan commitments.[26]

Pursuant to the Prepetition Credit Agreement and its accompanying documents (the "Prepetition Loan Documents"), the Debtors' borrowing base was 65% of the Debtors' inventory.[27] Also, the Prepetition Loan Documents permitted Capital One to

---

[23] *Id.*, ¶¶ 23-24.

[24] Id., ¶ 42.

[25] *Id.*, ¶ 39.

[26] *Id.*, ¶ 40.

[27] *Id.*, ¶ 43. "Inventory" is defined as "all inventory (as such term is defined in the New York Uniform Commercial Code, as in effect from time to time) the [Debtors] of every nature and description, now owned or hereafter acquired and wherever located (including without limitation goods and supplies," which is further defined.

monitor the Debtors' collateral, by performing field examinations, collateral analysis, collateral valuation, or any other business analysis or audit relating to the Debtors.[28] The Debtors also agreed to keep Capital One apprised of changes in their collateral and any material adverse effects (as defined by the Prepetition Credit Agreement).[29]

## C.   *The Yonkers Store's Roof Collapses*

Prepetition, NSC was insured by Zurich American Insurance Company ("Zurich"). The Zurich insurance policy provided general commercial liability insurance for NSC's operations and its retail locations.[30] Of relevance here, the Zurich insurance policy provided "Commercial Property Coverage" for each of NSC's retail stores, including in Yonkers, New York (the "Yonkers Store"). Specifically, Zurich's "Blanket Limit of Insurance" indicated that $37.6 million is "the most we will pay for direct physical loss or damage in any one occurrence to personal property …."[31]

In January of 2017, the Yonkers Store was forced to close because of a roof collapse and subsequent condemnation of the premises.[32] The roof collapsed because the landlord of the Yonkers Store brought a skid-steer loader onto the roof to clear snow, which crashed through the roof and into the interior of the store, causing extensive damage.[33]

---

[28] *Id.*, ¶ 44.

[29] *Id.*, ¶¶ 45-46.

[30] *Id.*, ¶ 47.

[31] *Id.*, ¶ 48-49 (internal quotations omitted).

[32] *Id.*, ¶ 56.

[33] *Id.*, ¶ 57.

Because the Yonkers Store was condemned by the local authorities, none of the inventory in the Yonkers Store was salvaged.[34]

Following the closure of the Yonkers Store, the Debtors made an insurance claim to Zurich for damages resulting from the roof collapse and subsequent condemnation, including for lost inventory. Zurich ended up paying approximately $9.9 million and thereafter initiated a subrogation lawsuit against the Yonkers Store's landlord.[35]

**D.  *Capital One Learns of Zurich's Valuation of Lost Inventory***

Once Capital One learned of the Zurich valuation of the lost inventory from the Yonkers Store, it commenced its own inventory audit.[36] As a result of that audit, Capital one learned that the Debtors were allegedly grossly overstating inventory values in borrowing base certificates.[37] Thus, Capital One called a default under the Prepetition Loan Documents, and the Debtors were forced into bankruptcy.

**E.  *The Debtors' Inventory Audit Process***

Although the Debtors used outside inventory service providers prior to 2010, after 2010, the Debtors conducted annual audits of their inventory using in-house personnel.[38] The in-house inventories were conducted by the Debtors' employees under the oversight of Imran Baig ("Baig"), the Debtors' District/Operations Manager, and were then

---

[34] *Id.*, ¶ 59.

[35] *Id.*, ¶¶ 60-61.

[36] *Id.*, ¶ 62.

[37] *Id.*

[38] D.I. 1, ¶¶ 50-51.

reported to Gold. However, Baig was allegedly never shown the inventory results prior to them being reported to Gold.[39]

Both before and after the Yonkers Store's roof collapsed, Gold provided monthly borrowing base reports to Capital One setting forth the value of the Debtors' inventory.[40] Defendant Gold also provided the Debtors' suppliers with financial statements. On March 30, 2018, Gold sent one of the Debtors' suppliers a preliminary financial statement for the 2017 year end with projected inventories in the amount of $29,975,000.[41] However, on the Debtors' 2017 tax returns, it appears that the Debtors may have overstated their inventory by roughly $11 million.[42] Also, while the same preliminary financial statement indicated that projected accounts payable and accrued expenses were $7,397,000, the Trustee alleges that this amount was actually around $28 million, representing a $16,083,015 increase in the value of the Debtors' accounts payable since the beginning of 2017 (approximately a 235% increase).[43]

The Trustee alleges that the stark changes in inventory and accounts payable balances reported on the Debtors' 2017 tax returns compared to 2016 accounted for an 85% decline in net worth in one year.[44] Not only that, but the Trustee also alleges that the

---

[39] *Id.*, ¶ 53.

[40] *Id.*, ¶ 65.

[41] *Id.*, ¶ 66.

[42] *Id.*, ¶ 67.

[43] *Id.*, ¶¶ 68-69.

[44] *Id.*, ¶ 71.

Debtors' "goodwill," listed on the Debtors' financial statements and tax returns in an amount of $9,508,290, was worthless.[45]

Upon the Trustee's information and belief, it is alleged that "the operating losses and equity declines reflected on the Debtors' 2017 tax returns were not all incurred in 2017 and reflect adjustments for prior years."[46] Namely, there was a "decline of approximately $30 million in retained earnings on sales of $9.1 million from the amount reported December 31, 2016 to the amount reported on January 31, 2017."[47] The Trustee alleges that it "is impossible … to lose $30 million in one month on $9 million in sales."

Furthermore, the Trustee alleges that the decrease in inventories reported on the 2017 tax returns was not a result of the Yonkers Store closing or the closing of one of the Debtors' stores in Massachusetts in early 2018. Rather, the Trustee alleges that "at year-end 2017, the Debtors undertook a "re-evaluation" of their reported inventory and accounts payable, which resulted in [their] massive $28 million negative adjustment to equity on the 2017 tax returns."[48]

Accordingly, it is the Trustee's position that, prior to the inventory write-down in early 2018, including at the times when: (i) the Debtors represented the value of their inventory to Capital One, and (ii) the Debtors made the insurance claim to Zurich, the

---

[45] *Id.*, ¶¶ 76-77.

[46] *Id.*, ¶ 78.

[47] *Id.*

[48] *Id.*, ¶ 83.

Debtors and their officers, directors, employees, managers and/or members misrepresented the extent and value of the inventory to Capital One and Zurich.[49]

In sum, the Trustee argues that:

> [t]he Debtors (by and through Scott and Gold, among others) failed to properly conduct independent audits of the inventory, misrepresented and overstated the inventory, understated accounts payable, executed and submitted borrowing base certificates that misrepresented and overstated the Eligible Inventory levels to Capital One, [and] misrepresented and overstated the inventory to Zurich.[50]

### STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6), made applicable to these proceedings through Fed. R. Bankr. P. 7012, permits courts to dismiss a complaint (or certain counts of a complaint) if they fail to state a claim upon which relief may be granted.[51]

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) "serves to test the sufficiency of the factual allegations in a plaintiff's complaint."[52] In order to survive a motion to dismiss, "a plaintiff's complaint must contain sufficient "factual allegations" which, if true, would establish "plausible grounds" for a claim: 'the threshold

---

[49] *Id.*, ¶ 84.

[50] *Id.*, ¶ 93.

[51] Fed. R. Civ. P. 12(b)(6).

[52] *In re Mervyn's Holdings, LLC*, 426 B.R. 96, 101 (Bankr. D. Del. 2010).

requirement … [is] that the plain statement possesses enough heft to sho[w] that the pleader is entitled to relief.'"[53]

In deciding a motion to dismiss under Rule 12(b)(6), courts draw all "reasonable inferences in a light most favorable to the plaintiff."[54] That being said, "a court need not credit a plaintiff's bald assertions or legal conclusions when deciding a motion to dismiss."[55] Accordingly, only well-plead facts are considered in ruling on a motion to dismiss, and conclusory statements may be disregarded.

## ANALYSIS

**A.  *Negligent Misrepresentation (Count I) and Common Law Fraud (Count II)***

**a.    Pleading Standard**

Although the Trustee argues otherwise, and regardless of whether New York or Delaware law applies to Counts I and II,[56] claims asserting negligent misrepresentation and fraud are governed by the heightened pleading standard of Fed. R. Civ. P. 9(b).[57] This heightened pleading standard "requires, at a minimum, that the plaintiff identify the

---

[53] *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L.Ed. 929 (2007)).

[54] *Id.* (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).

[55] *Id.* (internal citations omitted).

[56] *See Scwartzco Enter. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 349 (E.D.N.Y. 2014) (discussing how most New York courts opt to apply Rule 9(b) to negligent misrepresentation claims, especially when the "claim is based upon the same set of facts as those upon which a fraud claim is grounded …."); *see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 583 (2d Cir. 2005) (holding that claims for negligent misrepresentation under New York law "must be pled in accordance with the specificity criteria of Rule 9(b)."); *accord In re CBS Corp. S'holder Class Action & Derivative Litig.*, No. CV 2020-0111-JRS, 2021 WL 268779 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021) ("[O]ur law is clear that a claim resting on fraud or negligent misrepresentation must be supported by particularized facts."); *Student Fin. Corp. v. Royal Indem. Co. (In re Student Fin. Corp.)*, 2004 U.S. Dist. LEXIS 4952 at *6-8 (D. Del. Mar. 23. 2004) (dismissing negligent misrepresentation claim for failure to satisfy Rule 9(b)'s heightened pleading standard).

[57] Made applicable to these proceedings by way of Fed. R. Bankr. P. 7009.

speaker of the fraudulent statements,"[58] but does not require allegations "of date, place or time," as long as "some precision and some measure of substantiation" are pleaded in the allegations.[59]

That being said, the requirements of Rule 9(b) may be relaxed in cases involving trustees in complex bankruptcy cases.[60] This is because a trustee will ordinarily not be in a position to have all the facts necessary to support a valid claim without discovery.[61] That is not to say, however, "that a measure of particularity is not required."[62] Accordingly, against that backdrop, and for the reasons to follow, the Court finds that the Trustee has failed to state a claim against any of the Defendants for negligent misrepresentation or fraud.[63]

### b.    Applicable Law

The Defendants argue that New York law applies to the negligent misrepresentation and common law fraud claims,[64] while the Trustee argues that a choice of law analysis is premature at this stage of the proceedings and that the Defendants fail

---

[58] *Student Fin. Corp.*, 2004 U.S. Dist. LEXIS 4952 at *7.

[59] *Seville Indust. Mach. Corp. v. Southmost Co.*, 742 F.2d 786, 786 (3d Cir. 1984).

[60] *Charys Liquidating Trust v. Growth Mgmt., LLC (In re Charys Holding Co.)*, 2010 Bankr. LEXIS 2073 at *9-10 (Bankr. D. Del. July 14, 2010).

[61] *See Wyant v. Corr Med. Servs.*, 2005 U.S. Dist. LEXIS 26103 at *11 (D. Del. Nov. 1, 2005).

[62] *In re Charys Holding Co.* 2010 Bankr. LEXIS 2073 at *9-10.

[63] Even if the relaxed pleading standard of Fed. R. Civ. P. 8 applied, the Trustee's claims would nevertheless fail because the Trustee has failed to plead *any* facts, let alone *particularized* facts, to support the negligent misrepresentation and fraud claims.

[64] Adv. D.I. 18 (Def. Opening Brief), pg. 6-7.

to identify any material differences between New York and Delaware law as it pertains to these claims.[65]

Because the Court finds that there are no material differences between New York and Delaware law for purposes of the Court's negligent misrepresentation and common law fraud analyses under the facts of this case, an in-depth choice of law analysis is unnecessary.

### i.    Negligent Misrepresentation

To plead negligent misrepresentation under Delaware law, plaintiffs must prove: (1) a pecuniary duty to provide accurate information, (2) the supplying of false information, (3) failure to exercise reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon the false information.[66]

Under New York law, in order to sustain a claim for negligent misrepresentation, the plaintiff is required to demonstrate: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he knew or should have known was incorrect; (3) the information supplied in the representation was known by the defendants to be desired by the plaintiff

---

[65] Adv. D.I. 24 (Tr. Opposition), pg. 39.

[66] *Resolve Funding, LLC v. Buckley Property Serv's, LLC* 2018 WL 776417 at *4 (Del. Sup. Ct. Feb. 7, 2018) (internal citations omitted).

for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonable relied on it to his or her detriment.[67]

Accordingly, as is relevant here, both New York and Delaware law require plaintiffs to plead particularized facts showing a misrepresentation and reliance on that representation by the plaintiff. Because the Court finds, *infra*, that there are no facts pled to support the misrepresentation and the reliance elements of the claim as against any Defendant, it is immaterial which State's law applies.

### ii.    Common Law Fraud

Turning to the Trustee's fraud claim, under Delaware law, in order to sustain a cause of action for fraud, plaintiffs must prove: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representations; and (5) damage to the plaintiff as a result of such reliance.[68]

In New York, to sufficiently state a claim for fraud, plaintiffs must establish: (1) a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it; (2)

---

[67] *Anshutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012).

[68] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

justifiable reliance of the other party on the misrepresentation or material omission; and (3) injury.[69]

Like the negligent misrepresentation claim, both New York and Delaware law require plaintiffs to show that there was a misrepresentation, and reliance on that misrepresentation to sustain a claim for common law fraud. As noted above, because the Court finds that the Trustee has failed to plead facts to establish these elements, the common law fraud claim fails regardless of whether New York or Delaware law applies.

### c.    The Negligent Misrepresentation and Common Law Fraud Claims Fail as to All Defendants

Putting aside the technical threshold issue of whether the Trustee has standing to bring these claims, and assuming *arguendo* that the Trustee does have standing, these claims nevertheless fail because the Trustee's Complaint does not plead any facts to show that the Defendants misrepresented any information to the *Debtors*, or that the *Debtors* relied on any misrepresentations made by the Defendants.  On that basis alone, the Trustee's claims fail.[70]

The Complaint is entirely devoid of particularized facts showing that any of the Defendants made a misrepresentation to the Debtors, and that the Debtors relied on that misrepresentation to their detriment. Instead, with respect to negligent misrepresentation, the Complaint asserts that: "[t]he Defendants misrepresented and/or

---

[69] *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1183 (N.Y. 2018).

[70] Because the Court finds that the Complaint fails to allege facts to establish that the Defendants made misrepresentations to the Debtors and that the Debtors relied on these misrepresentations, the Court takes no position with respect to the remaining elements of these causes of action.

failed to disclose accurately to *Capital One and Zurich* … material facts concerning the Inventory,"[71] "*Capital One* justifiably and reasonably relied on the misrepresentations made by and the omissions of the Defendants,"[72] "*Zurich* ... relied justifiably and reasonably on the misrepresentations made by and the omissions of the Defendants concerning the Inventory following the roof collapse of the Yonkers store."[73]

With respect to common law fraud, the Complaint asserts that: "[t]he Defendants misrepresented and/or failed to disclose accurately to *Capital One and Zurich* … material facts concerning the Inventory levels,"[74] "[b]y entering into the Prepetition Loan Documents … *Capital One* justifiably and reasonably relied on the misrepresentations made by and the omissions of the Defendants,"[75] "[b]y entering into the [i]nsurance [p]olicies with the Debtors, *Zurich* justifiably and reasonably relied on the misrepresentations made by and the omissions of the Defendants,"[76] and "*Zurich* further relied … on the misrepresentations made by and the omissions of the Defendants concerning the Inventory following the roof collapse …."[77]

There are also facts plead to support that Gold sent one of the Debtors' suppliers, Arett Sales Corporation ("Arett'), information about inventory and accounts payable that

---

[71] Adv. D.I. 1, ¶ 102.

[72] *Id.*, ¶104.

[73] *Id.*, ¶ 105.

[74] *Id.*, ¶ 116.

[75] *Id.*, ¶ 118.

[76] *Id.*, ¶ 119.

[77] *Id.*, ¶ 120.

may have been misrepresented,[78] and that Arett "relied to their detriment on financial information provided by the Debtors … in making decisions to extend credit to the Debtors for future orders."[79]

Even in the Trustee's opposition, it is argued that the Defendants are attempting to "disavow responsibility for their negligence and misrepresentations to the *Debtor's insurer and secured lender* …."[80] The Trustee also argues that "the Complaint sets out in great detail the reliance that *third-party creditors and insurers* placed on Defendants' false statements concerning the Debtors' inventory and financial condition,"[81] and that "Debtors themselves … relied on the Defendants to ensure that those statements … were accurate and complete."[82]

In making this assertion, the Trustee cites to paragraphs 87-99 of the Complaint. However, those paragraphs do *not* plead any facts about the Debtors' alleged reliance. Instead, those paragraphs focus on the reliance of Arett,[83] Capital One,[84] and Zurich.[85]

---

[78] *Id.*, ¶¶ 66; 70 ("Gold sent an email to the Chief Financial Officer of Arett Sales Corporation, a supplier of the Debtors …." "The accounts payable amount set forth at year end in the Debtors' 2017 tax returns indicate that the "preliminary" accounts payable amount reported by Michael Gold to Arett Sales … was understated by more than $20 million.").

[79] *Id.*, ¶ 87.

[80] Adv. D.I. 24, pg. 1.

[81] *Id.*, pg. 35.

[82] *Id.*

[83] Adv. D.I. 1, ¶ 87.

[84] *Id.*, ¶¶ 88-90; 93; 97.

[85] *Id.*, ¶¶ 91-93.

Nowhere in those paragraphs are there any facts plead to support the *Debtors'* reliance on any misrepresentations.

In fact, when viewing the well-plead facts in a light most favorable to the Trustee, it appears that misrepresentations about inventory levels and accounts payable may have been made by the Defendants[86] to Capital One, Zurich, and Arett, for the purposes of receiving credit and insurance monies. It also seems that these parties may have relied on certain misrepresentations to their detriment. However, the Trustee does not stand in the shoes of Capital One, Zurich, and/or Arett; rather, the Trustee is in the shoes of the Debtors. There are no facts plead whatsoever to support that any misrepresentations or omissions were made *to the Debtors* and that the *Debtors relied* on said misrepresentations.

Because the Trustee fails to plead any facts to establish that there were misrepresentations or omissions made by the Defendants *to the Debtors*, and, independently, because third-party reliance is insufficient to establish the reliance prong of a fraud-based claim under both New York and Delaware law,[87] the Trustee has not met the necessary pleading burden sufficient to survive a motion to dismiss.

---

[86] *See id.*, ¶ 93. Although it is not abundantly clear from the Complaint which Defendants specifically made misrepresentations, the Complaint does state that "[t]he Debtors (by and through *Scott and Gold*) … misrepresented and overstated the Inventory, understated accounts payable ….").

[87] *See Jordan v. Mirra*, 2017 WL 4070646 at *18 (D. Del. Sept. 14, 2017*), report and recommendation adopted*, 2017 WL 5749664 (D. Del. Nov. 28, 2017) (adopting the interpretation of New York law which holds that "a plaintiff does not establish the reliance element of fraud for purposes of ... New York law by showing only that a third party relied on a defendant's false statements."); *see also XO Bistro, LLC v. Anthony Merrill & White Star, LLC*, 2021 WL 3214788 at *6 (VI Super. July 21, 2021) (discussing how Delaware is one of 11 states that does not recognize actions for fraud resulting from the reliance of a third party, instead, staying true to the Restatement (Second) of Torts, which requires "the plaintiff themselves to justifiably rely on the misrepresentation to their detriment). *See* Restatement (Second) of Torts § 525.

For the foregoing reasons, the Trustee fails to state a claim against any of the Defendants for negligent misrepresentation or common law fraud. However, because of the relaxed heightened pleading standard afforded to Trustee's in complex bankruptcy cases, and because the Trustee asserts that certain information is within the Defendants' control, the Court will dismiss Counts I and II against all Defendants *without prejudice*.

**B.  *Breach of Fiduciary Duty (Count III)***

### a.    Whether the Court May Consider the Operating Agreement

At the outset, the parties dispute whether the Court may consider the Debtors' Operating Agreement at the motion to dismiss stage. The Defendants argue that the Operating Agreement is integral to the Complaint, while the Trustee argues that this Court may not consider the Operating Agreement without converting the *Motions to Dismiss* into motions for summary judgment.

Pursuant to Fed. R. Civ. P. 12(b)(6), if matters outside of the pleadings are presented to and not excluded by the court, then the motion must be treated as one for summary judgment. A limited exception applies to "documents that are integral to or explicitly relied upon," in the complaint," which may be considered without converting a motion to dismiss into a motion for summary judgment.[88] "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited."[89]

---

[88] *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal citations and quotations omitted).

[89] *Id.* (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

Moreover, under Delaware law,[90] an operating agreement is a document integral to the complaint where the complaint alleges breaches of fiduciary duties.[91] This is because a "Defendants' fiduciary duties are governed by the Operating Agreement. Thus, a director's, officer's or manager's fiduciary duties may be contained in the Operating Agreement and so the Operating Agreement should be the point of departure for a Trustee claiming breaches of fiduciary duties."[92] "It would be judicially uneconomic for the Court to consider the Trustee's breach of fiduciary duty claims without considering the Operating Agreement."[93]

For these reasons, the Court finds that it may consider the Operating Agreement without having to convert these *Motions to Dismiss* into motions for summary judgment.

### b.    Pleading Standard and Applicable Law

The parties do not dispute that the Trustee's breach of fiduciary duty claim is subject to the pleading standard of Fed. R. Civ. P. 8.[94] That Rule requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[95] "A complaint need not contain detailed factual allegations, but a plaintiff's

---

[90] The parties agree that Delaware law governs the breach of fiduciary duty claim under the "internal affairs" doctrine, which provides that only the state of incorporation has the authority to regulate a corporation's internal affairs. *See Miller v. Greystone Bus. Credit II, L.L.C.*, 418 B.R. 533, 540 (Bankr. D. Del. 2009) ("Few, if any, claims are more central to a corporation's internal affairs than those relating to alleged breaches of fiduciary duties by a corporation's directors and officers.") (internal citations and quotations omitted).

[91] *In re W.J. Bradley Mortg. Cap., LLC*, 598 B.R. 150, 166 (Bankr. D. Del. 2019).

[92] *Id.*

[93] *Id.*

[94] Made applicable to these proceedings through Fed. R. Bankr. P. 7008.

[95] Fed. R. Civ. P. 8(a)(2).

obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do…."[96]

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[97] Defendants argue that neither the Trust Defendants nor Carrie owed the Debtors any fiduciary duties because the Debtors' Operating Agreement grants sole managerial authority to Scott. As for Scott and Gold, the Defendants argue, among other things, that the Trustee's breach of fiduciary duty claim is one for the breach of the duty of oversight (under the duty of care), and that the Trustee fails to plead facts to establish that either Scott or Gold breached their fiduciary duty with respect to overstating inventory levels or submitting borrowing base certificates with inaccurate information.

### c.    The Individual Defendants

#### i.    Scott Rosen and Michael Gold

In considering the well-plead facts and construing them in a light most favorable to the Trustee, the Court will deny the *Motions to Dismiss* as to the breach of fiduciary duty claim against Scott Rosen and Michael Gold.

---

[96] *In re troll Communications, LLC*, 385 B.R. 110, 117 (Bankr. D. Del. 2008).

[97] *Palmer v. Reali*, 211 F.Supp.3d 655, 666 (D. Del. 2016) (citing *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010)).

In Delaware, by default, "the management of an LLC shall be vested in its members," unless "otherwise provided in a limited liability company agreement."[98] Also, "[i]n the absence of language in an LLC agreement to the contrary, the managers of an LLC owe traditional fiduciary duties of care and loyalty."[99] To that end, the Delaware Limited Liability Company Act gives "the maximum effect to the principle of freedom of contract."[100]

Accordingly, drafters of an LLC agreement are afforded substantial deference under Delaware law. They may modify or eliminate fiduciary duties altogether (aside from the contractual covenant of good faith and fair dealing),[101] and may vest management authority in a specified manager(s), rather than have the members of an LLC be its managers under the default rule.

Here, Section 5 of NSC's Operating Agreement provides that, "[t]here shall be one Manager of [NSC]…The initial Manager … shall be Scott Rosen."[102] Scott, as the Manager of NSC, "may delegate the right, power and authority to manage the day to day business, affairs, operations and activities of [NSC] to any officer, employee or agent of the Manager of [NSC], subject to the ultimate direction, control and supervision of the

---

[98] 6 Del. C. § 18-402.

[99] *CSH Theaters, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684 at *11 (Del. Ch. April 21, 2015).

[100] *Id*.

[101] *Id*. ("The drafters of an LLC agreement can modify the traditional duties of care and loyalty or displace them altogether, but they cannot eliminate the implied covenant of good faith and fair dealing.") (internal citations and quotations omitted).

[102] Adv. D.I. 18, Ex. 2, (Operating Agreement § 5.01).

Manager."[103] The Operating Agreement does not modify or limit the fiduciary duties owed under Delaware law, thus, the default fiduciary duties of loyalty and care apply.[104]

The Complaint sufficiently alleges facts to establish that Scott owed fiduciary duties to NSC. To state the obvious, pursuant to the Operating Agreement (and as plead in the Complaint), Scott is the Manager of NSC[105] and, because the Operating Agreement does not eliminate or modify Delaware's traditional fiduciary duties, Scott owes NSC fiduciary duties.

That being said, the Complaint also sufficiently pleads facts to establish that Gold may owe NSC fiduciary duties. Although Gold is not NSC's manager, he is NSC's Chief Financial Officer.[106] The Operating Agreement gave Scott, as NSC's Manager, the authority to delegate responsibilities to officers of NSC; the Complaint sufficiently pleads that Gold was tasked with the responsibility of providing "monthly borrowing base reports to Capital One setting forth the value of the Debtors' Inventory …."[107] It is also sufficiently alleged that Gold e-mailed Arett's Chief Financial Officer with a preliminary financial statement that misrepresented NSC's inventory and accounts payable.[108] That being said, at this stage, the Trustee has set forth a sufficient factual basis to establish that

---

[103] *Id.*, § 5.02.

[104] [104] *CSH Theaters, LLC,* 2015 WL 1839684 at *11 ("[I]f the LLC agreement does not modify or eliminate the traditional fiduciary duties, then those fiduciary duties still apply.").

[105] Adv. D.I. ¶ 15.

[106] *Id.*, ¶ 17.

[107] *Id.*, ¶ 65.

[108] *Id.*, ¶¶ 66-84.

Gold exercised control over NSC's management such that it may be appropriate to impose fiduciary duties upon him.[109]

Now that it has been established that the Complaint sufficiently pleads that both Scott and Gold do and/or may owe NSC fiduciary duties, the Court must determine whether a breach of those fiduciary duties has been sufficiently pled. The Court finds that it has.

As noted above, with respect to Gold, the Complaint adequately alleges that Gold was misrepresenting the levels of the Debtors' inventory and understating accounts payable.  Although the Defendants argue that Gold was permitted to, and did, rely on internal auditing done by other employees, and that the internal auditing information flowed through the Debtors' Operations Manager, Baig, the Complaint alleges that Baig was "never shown the store inventory results."[110] Accordingly, construing the facts in a light most favorable to the Trustee, the Complaint adequately alleges a claim for breach of fiduciary duty against Gold.

As for Scott, given that he was the Manager of NSC with the responsibility of overseeing its day-to-day operations, as well as overseeing those to whom he delegated work, the Complaint adequately alleges that he may have breached his fiduciary duty of care by failing to become informed as to inaccurate information contained in the

---

[109] *See Klein v. Wasserman*, 2019 WL 2296027 at *7-8 (Del. Ch. 2019) (members who "control" an LLC may owe fiduciary duties; plaintiffs may establish control through "actual control" or "control over the business and affairs of the corporation."); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. 2012) ("[A] 'person' may owe fiduciary duties depending on whether that person controls a manager of the LLC or otherwise has a fiduciary relationship to the LLC ...").

[110] Adv. D.I. 1, ¶ 53.

borrowing base certificates which he authorized, and/or by failing to oversee the internal inventory audits. Although Defendants argue that the Trustee did not offer facts to support that the internal inventory audits were "lax," when viewing the Complaint as a whole and in a light most favorable to the Trustee, the Court finds that the Trustee has sufficiently alleged facts to indicate that the internal auditing may have been flawed.[111]

For the aforementioned reasons, the *Motions to Dismiss* are denied with respect to the breach of fiduciary duty claim against Scott and Gold.

### ii.    Carrie Rosen

There are no facts plead to support a breach of fiduciary duty claim against Carrie and, thus, the claim against her is dismissed without prejudice.

The Complaint alleges that Carrie was a "control" person and "a former manager/employee" of NSC,[112] NSC's "clothing buyer,"[113] and the co-trustee of the Carrie Trust.[114] And that's all. There are no facts alleged to establish that Carrie was, in fact, a "control person" of NSC (this is a conclusory allegation at best), there are no facts to substantiate which officer role she held, what her daily (or any) involvement was in managing NSC, what her specific involvement was with the Zurich insurance ordeal, the

---

[111] *Id.*, ¶¶ 65-84; 93.

[112] Adv. D.I. 1, ¶ 16.

[113] *Id.*, ¶ 33.

[114] *Id.*, ¶ 24 ("The Carrie Trust was controlled by Carrie and Carl Rosen, as co-trustees.").

inventory audits, and the circumstances surrounding the overstated inventory and understated accounts payable.

As discussed, Scott was the only Manager of NSC. Although the Court is permitting the breach of fiduciary duty claim to proceed against Gold, this is because the Complaint sufficiently lays out his position at NSC and shows that he did, in fact, exert some level of control over NSC's day to day operations which may warrant imposing fiduciary duties upon him, subject to what discovery reveals. Because Carrie was not NSC's Manager, and because the Complaint only offers a conclusory allegation of her status as a "controller" and "officer," there are no facts to warrant permitting a breach of fiduciary duty claim against her to proceed. Put otherwise, the Complaint does not sufficiently allege facts to establish that Carrie owed NSC any fiduciary duties.

For these reasons, this claim is dismissed. Keeping in mind the fact that the Trustee will engage in discovery that may bring additional information about Carrie's involvement and possible control to light, this claim is dismissed *without prejudice*.

> d.     **The Trust Defendants**

Similar to the foregoing, the breach of fiduciary duty claim is dismissed against the Trust Defendants without prejudice. Namely, the Complaint offers no factual

predicate upon which the Court may conclude that the Trust Defendants owed NSC any fiduciary duties.

The Trust Defendants are alleged to have been members of NSC.[115] As already discussed, members of a manager-managed LLC do not owe fiduciary duties absent a showing of control.[116] There are absolutely no facts alleged to indicate that the Trust Defendants exercised any control over NSC's day-to-day operations.

Although the Trustee argues that Carrie controlled the Carrie Trust and Scott controlled the Scott Trust, being in control of a trust that is a member of an LLC while also being a manager of that LLC (in Scott's case) does not automatically, without more, make the trust a controlling member of the LLC.[117] Instead, all that is alleged is that the Scott Trust (and the Carrie Trust) were members of NSC. In Carrie's case, the Court

---

[115] *Id.*, ¶¶ 18-19. As noted previously, the Carrie Trust owned 33.3% of NSC and NWL Lodi and the Scott Trust owned 33.4%. Accordingly, neither Trust was a controlling member or shareholder.

[116] *Feeley*, 62 A.3d 649 at 662 ("Managers and managing members owe default fiduciary duties; passive members do not.").

[117] Indeed, even the Trustee acknowledges that "corporate entities … [are] legally distinct from their principles …." *See* Adv. D.I. 24, pg. 29, n. 9. In making this statement, the Trustee argues that knowledge and intent may be imputed to an entity through its managers. While this may be true under certain circumstances (knowledge of a wrongdoer generally is not imputed), *see In re Am. Int'l Grp., Consol. Derivative Litig.*, 976 A.2d 872, 891 n. 50. (Del. Ch. 2009) (holding that "in a case where the agent's action is totally adverse to the interests of his principal, the law will not impute knowledge of the bad act to the principal,") the issue here is not knowledge but, rather, control.

already found that the Complaint does not sufficiently allege that she exercised control over NSC, thus, her control over the Carrie Trust is of no movement.

Because the Complaint does not sufficiently plead that the Trust Defendants owed NSC fiduciary duties, Count III is dismissed. However, for the same reasons stated with respect to Carrie, the dismissal will be *without prejudice*.

## CONCLUSION

For all the foregoing reasons, Counts I (negligent misrepresentation) and II (common law fraud) are dismissed against all Defendants without prejudice. Count III (breach of fiduciary duty) is dismissed against the Trust Defendants and Carrie Rosen without prejudice but will proceed as to Scott Rosen and Michael Gold. An order will be entered.